2020 IL App (1st) 171373-U

No. 1-17-1373

September 20, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 10366 |
| | ) | |
| LEVELLE HENRY, | ) | Honorable |
| | ) | Joan Margaret O'Brien, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    Held:  Defendant's conviction for attempt first degree murder is affirmed over his challenge to the sufficiency of the evidence he had intent to kill. The 25-year enhancement of defendant's sentence for attempt first degree murder is affirmed over his challenge to the sufficiency of the evidence he caused great bodily harm to the victim. Defendant's conviction for aggravated unlawful use of a weapon is vacated where the State did not establish he had not been issued a valid Firearm Owner's Identification Card. Defendant's sentences for aggravated battery and aggravated discharge of a firearm in the direction of another person are vacated pursuant to the one-act, one-crime doctrine.

¶ 2    Following a bench trial, defendant Levelle Henry was found guilty of three counts of attempt first degree murder, one count of aggravated battery, two counts of aggravated discharge of a firearm, two counts of unlawful use or possession of a weapon by a felon (UUWF), and one count of aggravated unlawful use of a weapon (AUUW). The court merged the attempt murder counts and sentenced defendant to 45 years' imprisonment for attempt murder and 10 years' imprisonment on the remaining counts, to run concurrently.

¶ 3    On appeal, defendant contends the evidence was insufficient to prove him guilty of attempt first degree murder where the State did not establish his specific intent to kill the victim, and AUUW where the State did not establish he had not been issued a valid Firearm Owner's Identification (FOID) card. Defendant also challenges his sentence for attempt first degree murder, arguing it was improperly enhanced by 25 years because the State failed to establish that he caused great bodily harm to the victim. Finally, defendant argues his convictions for aggravated battery and aggravated discharge of a firearm in the direction of a person should merge with his conviction for attempt first degree murder and be vacated pursuant to the one-act, one-crime doctrine. We affirm defendant's conviction for attempt first degree murder and the 25-year enhancement of his sentence. We vacate defendant's conviction for AUUW and his sentences for aggravated battery and aggravated discharge of a firearm in the direction of a person.

¶ 4                                 **BACKGROUND**

¶ 5    Defendant was charged with three counts of attempt first degree murder, one count of aggravated battery, two counts of aggravated discharge of a firearm, two counts of UUWF, and

one count of AUUW.[1] The charges arose out of an incident in the early morning hours of May 15, 2013, in which defendant shot Antonio Smith, causing a gunshot wound to Smith's arm. As defendant does not contest that he shot Smith, we recite only those facts relevant to the issues on appeal.

¶ 6 Chicago police detective Robert Girardi testified he was on duty on May 15, 2013, working with his partner. Shortly after 1:30 a.m., they were assigned to investigate an attempt murder on the 6600 block of South Evans Avenue in Chicago, in which a man named Antonio Smith had been shot. Smith had already been transported to the University of Chicago Hospital when Girardi and his partner arrived.

¶ 7 Girardi described the scene as a two-story apartment building. Smith lived in the basement apartment. Girardi observed gunshot damage to the basement apartment door and a bullet hole through the first-floor apartment window. Photographs of the scene identified by Girardi depict a bullet hole in the first-floor window, but do not show bullet damage to the basement apartment door directly below it.

¶ 8 Girardi and his partner went to the University of Chicago Hospital and spoke with Smith in the emergency room. Smith stated his friend "Levelle," whom he subsequently identified as defendant, shot him. Smith described defendant as a "long term" friend whom he had known for 20 years. He also mentioned an incident two days prior on May 13, 2013, in which a mutual friend of defendant and Smith shot at defendant. Girardi obtained a police report relating to the May 13

---

[1] Defendant was also charged with and found guilty of one count of armed habitual criminal and another count of AUUW. However, the court subsequently vacated these guilty findings and the State *nol-prossed* the two counts.

incident and, from it, was able to identify defendant, whom he also identified in court. Girardi and other officers then arrested defendant.

¶ 9     On cross-examination, Girardi testified that the basement and the first-floor apartments had separate front doors. The door to the basement apartment was directly underneath the windows of the first-floor apartment and was accessible by a set of stairs leading down to the door. Smith was in the hospital for a few hours and, at approximately 10:00 or 10:30 a.m. on May 15, 2013, Girardi accompanied Smith to his home so he could show Girardi what happened.

¶ 10     Chicago police officer Medina testified that, on May 15, 2013, she was on patrol and working with her partner in a marked police vehicle.[2] At approximately 1:30 a.m., Medina responded to a call of a person shot on the 6600 block of South Evans and arrived within five minutes of receiving the call. When Medina arrived, she saw Smith sitting on a chair on the front porch of a two-flat building. He had a gunshot wound to his upper left arm, and Medina could see blood on his arm. Smith told Medina defendant shot him. Smith was transported by ambulance to the University of Chicago Hospital.

¶ 11     Smith testified he was 37 years old and had known defendant, whom he identified in court, for 20 to 22 years. Smith and defendant knew each other from living in the same neighborhood and were friends in May 2013.

¶ 12     On May 13, 2013, defendant got into an argument with DeMario Webb, who was friends with defendant and Smith. Defendant called the police because Webb shot at him. Police arrested Webb at Smith's apartment in defendant's presence. The following day, May 14, 2013, Smith

---

[2] Medina did not provide her first name. Defendant's brief refers to Medina by female pronouns; the State's brief refers to Medina by male pronouns. The trial court referred to Medina as "her;" therefore, we refer to Medina using female pronouns.

confronted defendant and told him, "If you ever send the police to my house again about you and [De]Mario's stuff, I will beat the mess out of you." He also threatened to "bust all [defendant's] car windows."

¶ 13    At approximately 1:30 a.m. on May 15, 2013, Smith was sleeping on the couch in his basement apartment at the two-flat building on South Evans Avenue. He heard someone knocking at his door, and when he asked who it was, defendant identified himself. Smith opened the door, looked up, and saw defendant three to four feet in front of him, holding a small, black revolver. Defendant extended his right arm directly in front of his body and fired the revolver from three to four feet away. Smith was shot once in the left upper bicep. After defendant fired two shots, Smith closed the apartment door. He heard two or three additional shots. There was a bullet hole in the inner door to his basement apartment. Another shot struck a window of Smith's mother's apartment, directly above the door to his basement apartment. In a series of photographs, Smith identified the door to his basement apartment and the gunshot damage to the window of his mother's apartment upstairs.

¶ 14    Smith's girlfriend called the police, who came to the building. Smith was transported by ambulance to the University of Chicago Hospital, where he received treatment for his injury. At the hospital, Smith told Chicago police detectives that defendant shot him. He also told detectives that he and defendant knew the same people in the area of 67th and Langley, and he told them about the incident that occurred on May 13, 2013. Smith returned home later that day.

¶ 15    The bullet was still in Smith's arm at the time of trial. He showed the trial court a "really little" scar where the bullet entered his arm, which the court described as "a dark mark on his left upper arm."

¶ 16    On cross-examination, Smith testified he "couldn't accept" that defendant sent the police to his apartment to arrest Webb on May 13, 2013. He did not think there was anything wrong with Webb being arrested for committing a crime. But, in his view, the problem was that Webb and defendant were bringing "drama" about a radiator they had stolen to his apartment. The following day, defendant returned to Smith's apartment, and Smith said to him, "If you send the police to my house again with you and [De]Mario's dum[b] stuff, I'm going to beat your butt and I'm going to * * * bust the windows out of your car."

¶ 17    When defendant shot Smith on May 15, 2013, he was to Smith's side, not directly in front of him. As soon as Smith opened his inner front door, he was outside, because the outer front door was already open.

¶ 18    On September 28, 2013, Smith signed a handwritten recantation claiming he had "wrongfully accused [defendant] of being the one who shot [him] on 5/13/13." Smith admitted the recantation was not true, but stated he signed it "[b]ecause they were throwing cocktails in [his and his] mother's [apartment] building." By "cocktails," Smith meant Molotov cocktails, which caused a fire at the apartment building. Smith did not understand that defendant wanted his "help" until defendant's friend, "Booman," came to see him. After Smith signed the recantation, he and his family had no more problems and "didn't have to worry about it no more."

¶ 19    On redirect examination, Smith testified "Booman" asked him to "help" defendant by making a statement that defendant was not the person who shot him. Smith handwrote the recantation, and "Booman" drove him to a currency exchange, where he signed the statement.

¶ 20    The parties stipulated that Cook County Sheriff's sergeant Steven Bouffard was assigned to the Criminal Intelligence Unit and was familiar with the telephone recording system at Cook

County jail, where defendant had been incarcerated since May 15, 2013. The jail's system recorded phone calls made by defendant at 6:12 p.m. on September 26, 2013, and 9:36 a.m., 10:02 a.m., 6:33 p.m., and 6:49 p.m. on September 28, 2013.

¶ 21 During the phone call on September 26, 2013, defendant tells a woman he calls "ma" or "mom" that "Booman" visited him at the jail and discussed obtaining a "notarized letter." During the two morning phone calls on September 28, 2013, defendant repeatedly instructs the woman to tell "Booman" to "write the letter up," take it to the "dude" to sign it, have it notarized, and then give it to defendant's attorney. During the phone call at 6:33 p.m. on September 28, 2013, the woman says she received the signed and notarized "paper," and paid "Booman" $1,000, which is what "Booman" paid the "dude." Defendant instructs her to take the recantation to his attorney. During the phone call at 6:49 p.m. on September 28, 2013, a man describes how he told Smith what to write in the recantation. The man also describes paying Smith for the recantation, and driving him to have it notarized. The man admits "tampering with a witness." Defendant tells him not to tell anyone about obtaining the recantation from Smith.

¶ 22 The State moved four photographs of Smith's apartment building and audio recordings of defendant's phone calls into evidence without objection.

¶ 23 The State rested, and defendant made a motion for a directed finding, which was denied.

¶ 24 Defendant entered Smith's handwritten recantation into evidence.

¶ 25 The parties stipulated that Chicago police detective Darryl Mills was assigned to investigate an aggravated arson at Smith's apartment building on the 6600 block of South Evans on July 18, 2013. He interviewed Smith, who said he believed defendant may be responsible for the incident, and that he had "constant gang related altercations" with defendant.

¶ 26 Defendant also introduced a recording of a phone call defendant made from Cook County jail on July 14, 2014. During this phone call, defendant tells an unidentified man he believes the State is trying to connect him to the Molotov cocktail incident at Smith's apartment building and threats against Smith's life. Defendant insists he knows nothing about that incident and had nothing to do with it. A man named "Tonio" then speaks to defendant. Tonio states he is going to make sure defendant "come[s] home" because he wants defendant "out here in the world." Tonio asks why defendant's attorney has not attempted to speak to him, especially after receiving the recantation.

¶ 27 In closing, the State argued it established defendant's intent to kill Smith through evidence defendant went to Smith's apartment with a loaded gun and knocked on the door to get Smith to come outside so he could have a good shot at Smith. The State also noted that one of the shots defendant fired struck Smith in the left arm, just inches from his heart. In response, defendant attacked Smith's credibility, arguing his testimony was not believable due to the recantation and inconsistencies about what he told police in the aftermath of the Molotov cocktail incident. In rebuttal, the State argued the phone call recordings proved defendant, through "Booman," forced Smith to sign the recantation out of fear for his family's safety. The State also characterized the phone call recordings as evidence of defendant's "consciousness of guilt," arguing they showed he knew he was guilty and was trying to avoid conviction by forcing Smith to change his testimony.

¶ 28 The court found defendant guilty on all counts. In announcing its ruling, the court found Smith "not just credible, but extremely credible." The court accepted Smith's explanation he signed the recantation to stop the Molotov cocktail attacks on his family's apartment building. The

court also cited the phone call recordings as evidence of defendant's "consciousness of guilt," and as showing he engineered Smith's recantation.

¶ 29   Defendant filed a motion for a new trial, which was denied.

¶ 30   The court merged the three attempt first degree murder convictions, and sentenced defendant to 45 years' incarceration: 20 years, plus a 25-year enhancement for causing great bodily harm to Smith. Specifically, the court found defendant "caused great bodily harm to * * * Smith based on the location of that bullet wound * * * so close to an artery and that he does still carry the scar and a bullet in his body." The court sentenced defendant to 10 years' incarceration on each of the remaining counts, with all sentences to run concurrently.

¶ 31   Defendant filed a motion to reconsider sentence, which was denied.

¶ 32                                    **ANALYSIS**

¶ 33   On appeal, defendant first challenges his convictions for attempt first degree murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012)), and AUUW (720 ILCS 5/24-1.6(a)(1)/(3)(C) (West 2012)). Specifically, defendant contends the evidence was insufficient to support his conviction for attempt first degree murder where the State did not prove his specific intent to kill, and that the evidence was insufficient to support his conviction for AUUW where the State did not prove he had not been issued a valid FOID card.

¶ 34   When a defendant challenges the sufficiency of the evidence, the relevant inquiry upon review is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crimes beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29 (citing, *inter alia*, *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). We do not retry a defendant or substitute our judgment for that of the trier of fact with

respect to the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 223 Ill.2d 187, 242 (2006). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." (Internal citations omitted.) *Id.* This is because the factfinder is in the best position to perform those functions. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 35    Defendant was charged with attempt first degree murder for, with intent to kill, shooting Smith, which constituted a substantial step toward the commission of first degree murder, and personally discharging a firearm that proximately caused great bodily harm to Smith. 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012). To sustain this charge, the State had to prove beyond a reasonable doubt "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 12; 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012).

¶ 36    Attempt murder is a specific intent offense, so the State had to prove defendant had the specific intent to kill. *Viramontes*, 2017 IL App (1st) 142085, ¶ 12. "Intent is a state of mind which can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Brown*, 2015 IL App (1st) 131873, ¶ 14. There is a presumption of intent to kill where one voluntarily and willfully commits an act that has a natural tendency to destroy another's life.

*People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. "Generally, the act of firing a gun, with nothing more, is not sufficient to prove intent to kill." *Id.* But an intent to kill may be proven where the surrounding circumstances show that the defendant "fir[ed] * * * a gun at or towards another person with either malice or a total disregard for human life." (Internal quotations omitted.) *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). "It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to defendant's guilt." *Petermon*, 2014 IL App (1st) 113536, ¶ 39.

¶ 37    We find a rational trier of fact could find the State proved defendant's intent to kill Smith beyond a reasonable doubt. The trial court explicitly found Smith to be credible, and the testimony of a single eyewitness, if positive and credible, is sufficient to convict. *Siguenza-Brito*, 235 Ill. 2d at 228. Smith's testimony established defendant went to Smith's apartment in the early morning hours of May 15, 2013, armed with a loaded gun. A reasonable factfinder could infer defendant was looking for Smith because he went to a location where Smith was virtually certain to be: asleep in his own apartment at 1:30 a.m. Defendant knocked on Smith's door and identified himself to get Smith to open the door, supporting an inference he wanted a clear shot at Smith. Defendant pointed his loaded gun at Smith while Smith was standing in his doorway at the bottom of a stairway below ground level, leaving Smith virtually nowhere to flee. Defendant fired the gun toward Smith at close range, from three to four feet away. He fired at least twice, striking Smith once in the bicep, before Smith was able to close the door.

¶ 38    We have held "the very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *Petermon*, 2014 IL App (1st) 113536, ¶ 39. That is the case here, where defendant fired multiple shots at Smith at close range. Defendant acted with

" 'a total disregard for human life' " sufficient to support a finding of intent to kill when he fired the gun at Smith from a few feet away and easily could have killed Smith had the bullet struck him just a few inches to the right instead of in his left bicep. See *Id.* (quoting *Ephraim*, 323 Ill. App. 3d at 1110). Accordingly, the evidence was sufficient to support defendant's conviction for attempt first degree murder.

¶ 39 Nevertheless, defendant contends the State failed to carry its burden with respect to intent for three reasons: (1) defendant had no motive to kill Smith because he and Smith were lifelong "friends," (2) defendant did not make any statements or threats about killing Smith, and (3) if defendant actually intended to kill Smith, he would have done so, as he was only a few feet away when he fired the shots. We reject each of these arguments.

¶ 40 Motive is not an element of attempt first degree murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012)), so the State did not have to prove anything about defendant's motive or the nature of his and Smith's relationship in order to carry its burden of proof. The fact that defendant and Smith were friends does not negate defendant's intent to kill Smith. The trial court heard the evidence about Smith and defendant's relationship, and rejected the inferences defendant advances here; thus, we find defendant's argument unpersuasive. See *People v. Baugh*, 358 Ill. App. 3d 718, 737 (2005) (a defendant's arguments regarding the sufficiency of the evidence are unpersuasive to the extent "the weaknesses in the evidence that defendant cites on appeal were all presented to, and rejected by, the [trier of fact].").

¶ 41 Similarly, defendant has not presented, and we have not found, any authority requiring an explicit threat or statement of intent to support a conviction for attempt first degree murder. While threats made prior to a shooting may, of course, be taken as evidence of intent to kill (*People v.*

*Hill*, 276 Ill. App. 3d 683, 688 (1995)), it does not follow that a lack of explicit threats necessarily implies a lack of intent to kill. Defendant's arguments ask us to draw inferences in the light most favorable to defendant, which is contrary to the law (see *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)), and we need not accept defendant's proffered explanation of this shooting. See *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005).

¶ 42    Defendant's claim that, because he shot Smith non-fatally in the arm, one can only conclude he did not intend to kill Smith is similarly unpersuasive. As with defendant's earlier claims, to accept this argument would require us to view the evidence in the light most favorable to defendant, which we cannot do. See *Wheeler*, 226 Ill. 2d at 117. Indeed, we have rejected this exact argument in the past: "Poor marksmanship is not a defense to attempt murder, and it is a question of fact for the [factfinder] to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon and missed his target." (Internal citations omitted.) *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27; see also *People v. Johnson*, 331 Ill. App. 3d 239, 251 (2002) ("While none of the shots fired by defendant actually struck [the victim], poor marksmanship is not a defense to attempt first degree murder."). We defer to the trial court's determination that defendant intended to kill Smith despite the fact he did not actually do so. None of defendant's arguments warrant a finding that the State failed to establish his specific intent to kill Smith beyond a reasonable doubt. Accordingly, we affirm defendant's conviction for attempt first degree murder.

¶ 43    Defendant also submits, and the State agrees, the State failed to prove him guilty of AUUW because it did not establish that he had not been issued a valid FOID card. To prove defendant guilty of AUUW as charged in count 11, the State had to establish he knowingly carried a firearm

on or about his person when he had not been issued a valid FOID card. 720 ILCS 5/24-1.6(a)(1)/(3)(C) (West 2012). The State concedes it did not introduce sufficient evidence of this element and asks that defendant's AUUW conviction be vacated. Our review of the record on appeal confirms no witness testified he or she determined defendant did not have a valid FOID card, or that they requested his FOID card and he did not provide one. This lack of evidence requires vacatur of defendant's AUUW conviction. See *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 3 ("the simple absence of the presentation of a FOID card is insufficient to prove that a [defendant] actually lacked a FOID card."). Accordingly, we vacate defendant's conviction for AUUW with respect to count 11.

¶ 44    Defendant next raises two challenges to his sentence. First, he argues his sentence for attempt first degree murder was improperly enhanced by 25 years because the State failed to prove he caused the aggravating factor of great bodily harm to Smith. Defendant argues he should have been sentenced in the range of 26 to 50 years' incarceration for the attempt first degree murder conviction, not 31 years to natural life.

¶ 45    A sentence for attempt first degree murder is enhanced by 25 years or up to a term of natural life when a defendant discharges a firearm that causes great bodily harm. See 720 ILCS 5/8-4(c)(1)(D) (West 2012). Proof of great bodily harm requires the State to "demonstrate an injury 'of a greater and more serious nature than simple battery and centers on the injuries the victim actually received.'" *People v. Reed*, 2018 IL App (1st) 160609, ¶ 44 (quoting *People v. Steele*, 2014 IL App (1st) 121452, ¶ 28). Upon review, we consider the injury "'actually received, the evidence of the nature and extent of the victim's injury and evidence of the treatment required.'"

*Id.* (quoting *In re J.A.*, 336 Ill. App. 3d 814, 818 (2003)). Whether great bodily harm occurred is a question of fact. *Id.*

¶ 46    We find the State established beyond a reasonable doubt Smith suffered great bodily harm. The evidence of Smith's injury and medical treatment was uncontradicted. Smith was struck by a bullet in the upper left bicep and had to be taken to the emergency room by ambulance. Officer Medina saw him bleeding from the bullet wound when she arrived on scene. The bullet remained inside Smith's body at the time of trial. Although Smith described his scar as "really little," the trial court could see it from the bench as a "dark mark on his upper left arm." From that firsthand observation of Smith and his scar, the trial court concluded he suffered great bodily harm. We will not substitute our judgment for the firsthand observations of the trial court. See *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). We find the State's proof of great bodily harm was sufficient to support the enhancement of defendant's sentence under section 5/8-4(c)(1)(D). See *People v. Reed*, 2018 IL App (1st) 160609, ¶ 45 (evidence sufficient to establish great bodily harm where victim did not initially realize he was shot, but suffered gunshot wounds to right little finger and right side, and bullet was inside his body at time of trial).

¶ 47    We find the cases relied on by defendant distinguishable, as they do not involve a shooting victim who still had the bullet lodged in his body at the time of trial. See *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996) (stabbing); *In re J.A.*, 336 Ill. App. 3d 815, 817-19 (2003) (stabbing); *People v. Watkins*, 243 Ill. App. 3d 271, 278 (1993) (shooting graze wound); *People v. Figures*, 216 Ill. App. 3d 398, 402 (1991) (gunshot pierced the victim's shoe, not his skin); *People v. Ruiz*, 312 Ill. App. 3d 49, 63 (2000) (gunshot wound "barely visible" even on the day of the incident).

Accordingly, we affirm defendant's 25-year sentencing enhancement under section 5/8-4(c)(1)(D).

¶ 48    Finally, defendant maintains, and the State agrees, his convictions for aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2012)) and aggravated discharge of a firearm in the direction of a person (720 ILCS 5/24-1.2(a)(2) (West 2012)) should merge with his attempt murder conviction under *People v. King*, 66 Ill. 2d 551 (1977). We agree.

¶ 49    In *King*, our supreme court held "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act," also known as the "one-act, one-crime" rule. *People v. Coats*, 2018 IL 121926, ¶ 11 (citing *King*, 66 Ill. 2d at 566). In addition, if an offense is a lesser included offense, multiple sentences are improper. See *People v. Miller*, 238 Ill. 2d 161, 165 (2010). Rather, sentence should be imposed on the more serious offense. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law subject to *de novo* review. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 147.

¶ 50    Defendant's aggravated battery sentence must be vacated because, as charged here, aggravated battery is a lesser included offense of attempt first degree murder. Both charges were premised on the singular act of defendant discharging a firearm, shooting Smith, and causing him injury. The only substantive difference between the two charges is that attempt murder required proof of defendant's intent to kill. Thus, aggravated battery is a lesser included offense of attempt first degree murder. *See People v. Washington*, 2019 IL App (1st) 161742, ¶ 28. As only the sentence on the most serious offense may stand (*Artis*, 232 Ill. 2d at 170), the sentence on the

aggravated battery charge must be vacated and the count merged into the attempt murder conviction. *People v. Gordon*, 378 Ill. App. 3d 626, 642 (2007).

¶ 51     Similarly, defendant's sentence for aggravated discharge of a firearm premised on his personally discharging a firearm in the direction of Smith must be vacated and the count merged with the attempt murder conviction because both charges were based on the same physical act of firing a gun at Smith. *Id.* Defendant does not challenge his sentence on the second count of aggravated discharge of a firearm, which was premised on his discharging a firearm at or into Smith's apartment building knowing it to be occupied. Thus, his conviction for that count of aggravated discharge of a firearm stands. Accordingly, we vacate defendant's sentences for aggravated battery and aggravated discharge of a firearm in the direction of a person and merge those counts into the attempt murder conviction.

¶ 52                                                           **CONCLUSION**

¶ 53     For the foregoing reasons, we affirm defendant's conviction for attempt first degree murder and his sentence of 45 years' incarceration for attempt first degree murder. We vacate defendant's conviction for AUUW (count 11). We vacate the sentences for aggravated battery (count 4) and aggravated discharge of a firearm in the direction of a person (count 7), and merge those counts into the attempt first degree murder count (count 3).

¶ 54     Affirmed in part and vacated in part.